**12-4168**

## UNITED STATES COURT OF APPEALS

## FOURTH CIRCUIT

### UNITED STATES OF AMERICA,
*Appellee*

**v.**

### RAYMOND DANGELO ALLEN
*Appellants*

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA,
BRYSON CITY DIVISION,
THE HONORABLE MARTIN L. REIDINGER, PRESIDING**

**BRIEF FOR THE APPELLANT**

Aaron E. Michel
Attorney at Law
3736 Surry Ridge Court
Charlotte, NC 28210-6921
704-451-8351

Counsel for Appellant Allen

# TABLE OF CONTENTS

**Page**

**Statement of Jurisdiction** ........................................................**1**

**Statement of Issues**..................................................................**1**

**Statement of the Case** ............................................................**1**

**Statement of the Facts** .......................................................... **32**

**Summary of Argument**.......................................................... **35**

**Argument** ................................................................................ **36**

    **I.**    **There was insufficient evidence to support the verdict** ........... **36**

    **II.**    **The Due Process right to a fair trial was violated by the concealed corruption of government witnesses** ....................... **40**

    **III.**    **The Fair Sentencing Act's new, lower mandatory minimums apply to the post-Act sentencing of pre-Act offenders**............. **44**

**Conclusion** .............................................................................. **45**

**Request for Oral Argument** .................................................. **46**

**Certificate of Compliance** .................................................... **45**

**Certificate of Service** ............................................................ **46**

**Signature** ................................................................................ **47**

# TABLE OF AUTHORITIES

Page

## CASES

*Bose Corp. v. Consumers Union of the United States*,
  466 U.S. 485 (1984) .............................................................. 40, 44
*Dorsey v. United States*, __ U.S. __, no. 11-5683 (June 21, 2012) ......... 44-45
*Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105 (2d Cir. 1997) .................... 37
*Gonzales v. Raich*, 545 U.S. 1 (2005) .................................................
*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................ 41
United States v. Bullard, 645 F.3d 237 (4th Cir. 2011) ................................. 44
*United States v. Aguilar*, 515 U.S. 593 (1995) .................................................
*United States v. Buffey*, 899 F.2d 1402 (4th Cir. 1990) ........................................
*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996) ......................... 36
*United States v. Darby*, 37 F.3d 1059 (4th Cir. 1994) ........................................
*United States v. Giunta*, 925 F.2d 758 (4th Cir. 1991) ................................. 36
*United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010) ............................. 37
*United States v. Kelly*, 35 F3d 929 (4th Cir. 1994) ........................................ 41
*United States v. Lopez*, 514 U.S. 549 (1995) .................................................
*United States v. Morrison*, 529 U.S. 598 (2000) .................................................
*United States v. Roberts*, 915 F.2d 889 (4th Cir. 1990) ........................................
*United States v. Romer*, 148 F.3d 359 (4th Cir. 1998) ................................. 36
*United States v. Spagnola*, 546 F.2d 1117 (4th Cir. 1976) .................................
*United States v. Teffera*, 985 F.2d 1092 (D.C. Cir. 1992) ........................... 37
*United States v. Williams*, 342 F.3d 350 4th Cir. 2003) ...................................

## STATUTES

18:841 ....................................................................................... passim
18:846 ....................................................................................... passim
18:851 ....................................................................................... passim
18:3231 ............................................................................................1
18:3553 .......................................................................................... 45
18:3742 ............................................................................................1
28:1291 ............................................................................................1

## CONSTITUTION

U.S. Const., Amend. V ....................................................... passim

**RULES**

FRCrP 29 ............................................................................... passim

**OTHER REFERENCES**

Ian Weinstin, *Regulating the Market for Snitches*, 47 Buffalo L. Rev. 563 (1999) ....................................................................................... 40

Frank O. Bowman, III, *Departing Is Such Sweet Sorrow: A Year of Judicial Revolt on "Substantial Assistance" Departures Follows a Decade of Prosecutorial Indiscipline*, 29 Stetson L. Rev. 7 (1999) ............................ 40

1999Cynthia K.Y. Lee, *From Gatekeeper to Concierge: Reigning in the Federal Prosecutor's Expanding Power Over Substantial Assistance Departures*, 50 Rutgers L. Rev. 199 (1997) ................................................ 40

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This

Court has jurisdiction pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742.

## STATEMENT OF ISSUES

I.      Whether there was sufficient evidence to support the verdict?

II.     Whether the defendant's Due Process right to a fair trial was violated by the concealed corruption of government witnesses?

III.    Whether the Fair Sentencing Act's new, lower mandatory minimums apply to the post-Act sentencing of pre-Act offenders?

## STATEMENT OF THE CASE

On October 5, 2010, the Asheville federal grand jury charged Mr.

Allen and ten others with participating in a crack cocaine conspiracy

allegedly occurring between January and June of 2010 in Buncome and

McDowell counties, North Carolina. (J.A. 11).

On October 15, 2010, Mr. Allen was denied reasonable bail in a

jurisdiction that has circumvented the Eighth Amendment by nationalizing

the bail bonding business. (J.A. 15). At that same time the standard

discovery order and arraignment orders were issued and the case was set for

trial on November 1, 2010. (J.A. 19, 26). On that same day Mr. Allen moved

to continue because the trial date was less than the minimum 30 days set by statute between the time of arraignment and the time of trial. (J.A. 24).

On October 19, 2010, the government gave notice that it had no objection to the continuance. (J.A. 29). At that same time the District Court granted the motion to continue but did not specify the next trial date. (J.A. 31).

On October 29, 2010, Mr. Allen moved for discovery after complying with local rules governing voluntary exchange of discovery. (J.A. 33).

On November 10, 2010, the District Court granted the motion for discovery. (J.A. 35). Two days later, the government filed a notice of compliance with the court order. (J.A. 36).

On December 14, 2010, the District Court sua sponte continued the case from the January term of court without specifying when the case would come before the court for trial. (J.A. 41).

On February 8, 2011, Mr. Allen moved for severance of his trial from that of the co-defendants. (J.A. 43). Mr. Allen pointed out that the District Court gave as part of its reasons for continuance the absence of a motion for severance. He also pointed out that there was no connection between him and the co-defendants, specifically, the discovery suggested a conspiracy to

2

sell Mr. Folston, previously indicted under a separate indictment, crack cocaine on two occasions unrelated to the co-defendants in the indictment against Mr. Allen. Rule 8(b) only permits joinder if the defendants participated in the same acts and the discovery suggested that there was no known connection between Mr. Allen and the co-defendants. Rule 14(a) permits severance to prevent prejudice to the defendant and the joinder of co-defendants for trial with Mr. Allen would delay his trial, confound the jury with evidence inadmissible against Mr. Allen involving alleged conspiracies in which he did not participate, and allow the government to conflate the evidence of a conspiracy allegedly involving Mr. Allen.

The next day the District Court granted the co-defendant's motion to continue. (J.A. 46). Mr. Allen's motion for severance was not specifically addressed and the court merely said that "no motion for severance has been granted." (J.A. 47).

The following day the government filed a response to the motion for severance. (J.A. 50). The government maintained that drug transactions between co-conspirators constituted "a common plan or scheme." (J.A. 52). What this means depends on what the word "common" means. Does this word refer to the nature of the transaction or the nature of the relationship between the parties to each transaction? The government believes that it

3

refers to the former and thus a person who enters into a transaction to sell crack is in cahoots with the buyer and whoever the buyer has bought from before and after and whoever the buyer sells to before or after the transaction in question. The plan or scheme is common in that it involves the distribution of crack, the nature of the transaction, rather than the specific relationships between transactions.

On February 14, 2011, the District Court denied the motion for severance. (J.A. 59).

On March 7, 2011, Mr. Allen moved to dismiss for lack of a speedy trial. (J.A. 63). The clock began to tick on October 13, 2010, and the case was on the May 2011 trial calendar, a time span of 209 days, far exceeding the 70 days allowed by the Speedy Trial Act and in excess of that permitted by the Sixth Amendment to the U.S. Constitution. Even subtracting the initial continuance relating to the 30 day minimum time period allowed between arraignment and trial and the short time it took for the District Court to address the motion for severance, a total of 45 days, did not cure or justify the delay.

The government filed its response to the motion to dismiss on March 17, 2011. (J.A. 69). The justification given for the delay was based on the joinder of the co-defendants for trial with Mr. Allen. The co-defendants were

4

arrested only after Mr. Allen was arrested. Seven co-defendants entered guilty pleas between December 29, 2010, and March, 27, 2011, and at least two of the three remaining co-defendants were expected to plead guilty by the May trial date.

On April 18, 2011, Mr. Allen filed an objection to a co-defendant's motion to continue, renewing his Speedy Trial and severance motions and begging for his day in court in May. (J.A. 90).

The District Court denied the motion to dismiss on March 23, 2011. (J.A. 81).

On April 28, 2011, the government filed a notice under § 851 of its intent to seek enhancement of the statutory ranges of punishment based on 1997 and 2009 felony drug convictions. (J.A. 92). There is no explanation given for why it was not filed at or near the time of the indictment.

On May 1, 2011, Mr. Allen objected to the classification of his prior 1997 and 2009 convictions as predicates under § 851, pointing out that Mr. Allen could not have received a sentence of imprisonment in those cases that would have exceeded the one-year threshold under the statute. (J.A. 94).

On May 2, 2011, Mr. Allen renewed his motion for severance for reasonable bail. (J.A. 97). Co-defendant Battle moved to continue. (J.A.

5

101). The government filed its response to Mr. Allen's motion the next day repeating its argument about proper joinder and the meaning of "common plan or scheme." (J.A. 104). The government found it "hard to fathom how defendant Allen's right to a speedy trial is being sacrificed if there, to date, has been no violation of the Speedy Trial Act." (J.A. 112). The speedy trial rule implicates not just the sovereignty of the individual accused but also the sovereignty of the people, and both deserve more deference than the government gives in these cases.

On May 4, 2011, the District Court heard the motion for severance. (J.A. 115). The government maintained its view that there was one conspiracy consisting of everyone who had engaged in a crack transaction with someone who had directly or indirectly dealt with the person, Mr. Folston, who allegedly engaged in two transactions with Mr. Allen. Upon this foundation, the government informed the court that to try Messrs. Allen and Battle separately would involve two trials involving significantly the same witnesses (27) and exhibits (33). (J.A. 116-7). Even though the co-defendant did not participate in the alleged two transactions between Folston and Mr. Allen or subsequently buy the crack allegedly purchased from Mr. Allen or even supply the crack to Mr. Allen, the government informed the

6

court that, "My proof is going to be the same for each of them." (J.A. 118). The District Court denied the motion for severance. (J.A. 126).

On May 5, 2011, Mr. Allen filed a motion for reasonable bail pending trial. (J.A. 129).

The following day the District Court filed its order granting the co-defendant's motion to continue the case without setting a new date and denying Mr. Allen's motion for severance and a speedy trial. (J.A. 131).

At that same time, the Magistrate filed an order denying Mr. Allen reasonable bail. (J.A. 137).

On June 14, 2011, Mr. Allen moved for production of the PSI reports and sentencing memorandum for eight government witnesses. (J.A. 140). Two days later the District Court denied the motion. (J.A. 143).

On June 22, 2011, Mr. Allen moved ex parte for authorization to retain an expert in the field of federal criminal practice and procedure to explain the legal terms associate with U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) and 21 U.S.C. § 851 and how they may apply to government witnesses. (J.A. 148). Similar to how the government uses experts to explain terms associated with crack and its distribution and how these terms may apply to the case against the defendant.

7

On June 24, 2011, the government filed its proposed witness list containing the 27 witnesses it had referenced in the severance hearing. (J.A. 153).

On that same day the government filed a motion to exclude the defense's use of an expert in the field of federal criminal law, to prohibit arguments having the effect of jury nullification (results oriented to say the least), and to prohibit disclosing to the jury the statutory and guideline punishment faced by the government witnesses under federal criminal law. (J.A. 155).

The third item is phrased as a particularization of the second item, showing that the concern about "nullification" is really about "impeachment" of the government witnesses by the truth about the benefits of testifying for the government. The government can't even be candid about its concerns, camouflaging from the court its true concern about impeachment and the results of that impeachment by using the word nullification, as if any judgment inconsistent with the government on the question of guilt or credibility of their witnesses would be a judgment rendered on an improper basis.

On June 25, 2011, Mr. Allen filed a motion to exclude evidence of the prior convictions contained in the § 851 information. (J.A. 166). Mr. Allen

8

also responded to the government's motion to gag the defense from cross-examining about the statutory and guideline punishment faced by government witnesses. (J.A. 167).

On June 27, 2011, the parties appeared before the District Court for jury selection. (J.A. 173). The government was careful to screen out prospective jurors who would even question the credibility of government witnesses who benefit from their assistance to the government at the expense of the defendant. (J.A. 221-3).

The District Court ordered that the parties would maintain the exhibits offered and admitted into evidence. (J.A. 270).

Before proceeding to hear testimony, the District Court addressed pretrial issues. As to the proposed use by the defense of an expert in federal criminal law and procedure to help the jury understand what the government witnesses were facing, the District Court said, "there is no basis on which to call an expert to explain the law to the jury. To the extent that the explanation of the law needs to be done in this case, that's part of my job." (J.A. 274-5). We will have to remember that when the government wants to use an expert, such as the case agent, to help the jury understand the drug laws or the immigration laws, or the firearm laws.

9

As to the issue the government considers nullification, the District Court limited the defense out of fear that it may feel sympathy for Mr. Allen, "for you to start talking about terms of years for all eight of these witnesses so that all you do is present, in essence, the sentencing paradigm for the jury, that's not going to be allowed because that crosses the line; that pollutes the waters for the jury to start figuring out what the potential sentences are for this defendant." (J.A. 281-2). One corruption, hiding the truth about what the defendant faces (something routinely shared in state criminal courts where the police power has traditionally rested), has lead to another corruption, hiding the truth about what the government witnesses face.

The District Court ordered sequestration of the witnesses, (J.A. 287), and gave the jury their preliminary instructions. (J.A. 294).

The government gave its opening statement telling the jury, "in January of 2010 crack cocaine was a significant problem in McDowell County, specifically within the Hill community, which as you'll come to learn is a lower-income, high-crime area…." (J.A. 308). The government certainly cut to the chase about what the problem was that the government was going to solve with the jury's help. The conspiracy was described as everyone involved, "from top to bottom." (J.A. 309). This included, "the street dealers within the Hill community," the "three larger dealers in

10

Marion" where the street dealers went for their supply of crack, their

"primary source," located in Old Fort, his "Asheville-based sources, a

Asheville-based customer of the Asheville-based source, and Mr. Allen, who

allegedly supplied the Old Fort source with 1 ½ ounces on one occasion and

2 ounces on another occasion. (J.A. 309-11).

The first government witness was Shanon Smith, the lead investigator

in the case for the McDowell County Sheriff's Office. (J.A. 320-1). He

confirmed that Shawn Boyce, Mario Carson, Derrick Forney, Brandon

Ledbetter, Carlos Twitty, Brandon Walker, Nicholas Wilkerson, and

N'Namdi Young were targets of the investigation. (J.A. 320-7). Photographs

of each of these targets were introduced into evidence. Id. Caption Smith

testified that these people "were the lower rung of this organization. They

were the street-level dealers, the guys that we call the runners or the street-

level dealers." (J.A. 329). Caption Smith testified that these people operated

in Marion in a "section that's commonly referred to as 'The Hill.'" (J.A.

329). Captain Smith testified that this area is "a lower-income, high-crime

area of the city of Marion." (J.A. 329).

Captain Smith then confirmed that Joshua Toms, Markeenus

Wilkerson, and Kingsley Agbaeze were targets of the investigation. (J.A.

329-332). Photographs of each of these targets were introduced into

11

evidence. Id. Captain Smith testified that they "were the mid-level. These guys were the individuals supplying all the street-level dealers that we went through just a moment ago." (J.A. 332).

Captain Smith confirmed that Chrisshown Folston was a target of the investigation, a photograph of him was introduced into evidence, and he was described as "operating out of the Old Fort area. He was above Markeenus and Kingsley and Joshua Toms, and he was supplying those individuals with crack cocaine." (J.A. 333).

Captain Smith confirmed that Willie Chappell, Jonathan Daniels, Mr. Allen, and Reggie Battle were targets of the investigation, a photograph of each of them was introduced into evidence, and they were described as "out of Buncombe County, and … were supplying Chrisshown Folston with crack cocaine. So they would be above or higher up on the tier than Chrisshown Folston." (J.A. 333-8).

Captain Smith testified that Jonathan Gibson was an informant who was paid about $800 for his cooperation in the investigation. (J.A. 340). He testified that Sidney Butler was an informant who was "working off a case" and "working for money." (J.A. 341-2). The payments totaled $120. Id.

12

Captain Smith testified that on March 4, 2010, he and North Carolina State Bureau of Investigation Randy Wood used informant Jonathan Gibson to make a controlled buy from Brandan Walker in The Hill community. (J.A. 342-8).

Captain Smith testified that on April 23, 2010, he, Agent Wood, Lieutenant Chris Taylor from the Marion Police, and Detective Jason Grindstaff from the McDowell Sheriff's Department used informant Sidney Butler to make a controlled buy from Carlos Twitty. (J.A. 350-2).

Captain Smith testified that on May 6, 2010, he, Agent Wood, Lieutenant Taylor, and Detective Grindstaff used informant Gibson to make a controlled buy from Nicholas Wilkerson. (J.A. 353-6).

Captain Smith testified that Robin Anderson, the girlfriend of Chrisshawn Folston, was an informant. (J.A. 356-8). On May 6, 2010, she sent Captain Smith a photograph of "crack cocaine that was in her and Chrisshown Folston's refrigerator." (J.A. 358-60). This was in Old Fort. (J.A. 361).

Captain Smith testified that informant Anderson called on May 13, 2010, to say that she and her boyfriend "were going to Asheville to meet with Willie Chappell to purchase crack cocaine." (J.A. 362).

13

Captain Smith testified that informant Anderson called on May 17, 2010, to say that she and her boyfriend "were going to Buncombe County to purchase crack cocaine from Raymont Allen." (J.A. 363).

Captain Smith testified that informant Anderson called on May 18, 2010, to say that she and her boyfriend "were to go back to purchase more crack cocaine from Raymont Allen." (J.A. 363-4).

Captain Smith testified that informant Anderson called on June 10, 2010, to say that she and her boyfriend "were going back to Asheville to purchase crack cocaine form Willie Chappell." (J.A. 365). They were arrested as they returned to McDowell County and crack cocaine seized. (J.A. 366-9).

Informant Jonathan Gibson testified that he was a convicted felon and drug user and participated in controlled buys of crack cocaine.  (J.A. 419-20). He denied participating in order to work off "any kind of cases." (J.A. 420). He testified that he was participating in order to eliminate his supply and thereby stop him from using. Id. He admitted that he was paid about $2,000. (J.A. 421).

Informant Sidney Butler testified that he was a habitual felon and drug dealer and participated in controlled buys of crack cocaine. (J.A. 428-9). His

14

participation was a result of his getting caught with drug paraphernalia. (J.A. 430). He also testified that, "my mother lives in that community. She's 75 years old. I'm 49 years old today, thank God. I don'thave – I have very little tolerance for drugs, period, sir." (J.A. 432). He also received money for his participation. (J.A. 434).

Agent Wood testified about his participation in the investigation into the alleged conspiracy. (J.A. 440-1). He admitted knowing informant Robin Anderson, "since early childhood," but denied knowing she sold crack cocaine. (J.A. 452).

The District Court did not allow Mr. Allen to confront Agent Wood about his debriefing of co-conspirator Dewan McCullough and information concerning McCullough's purchase of crack cocaine from Ms. Anderson. (J.A. 457-9). Mr. Allen tendered this as evidence that tended to show that Ms. Anderson's testimony needs corroboration if the jury is to believe it. Id.

Lieutenant Taylor testified about his participation in the investigation into the alleged conspiracy. (J.A. 470-2).

Elizabeth Reagan testified about her examination of seized suspected crack cocaine and opinion that it was crack cocaine. (J.A. 476-490).

15

Alleged accomplice, co-conspirator Carlos Twitty testified that he was charged with being a participant in the conspiracy, was assisted by counsel, was a convicted felon, and pled guilty to the conspiracy charge. (J.A. 492-5). The conspiracy to which he pled involved the sales of crack cocaine to informants, consisting of more than 22.4 but less than 28 grams. (J.A. 495-6). If he didn't tell the truth, the plea arrangement is void. (J.A. 496). Mr. Allen was not allowed to present expert testimony about how that works, specifically, who gets to decide if the government witness is telling the truth and how often a government witness loses his plea bargain by testifying for the government and against the defendant, regardless of the truth about the defendant.

Alleged accomplice, co-conspirator Nicholas Wilkerson testified that he was charged with being a participant in the conspiracy, was assisted by counsel, was a convicted felon, and pled guilty to the conspiracy. (J.A. 527-529). The conspiracy to which he pled involved the sales of crack cocaine to informants, consisting of between 5 and 20 grams. (J.A. 529-30). If he didn't tell the truth, the plea arrangement is void. (J.A. 530).

He testified that he struck up a conversation with Mr. Allen while they were subject to pretrial detention. (J.A. 539-40). He said, "we'd all be partying if Robin and Fat Boy had have kept their mouths shut and hadn't

16

told on everybody and got all this stuff started." (J.A. 540). Mr. Allen's alleged response was that, "You got that right. She the one that got me, too. Set me up. Ounces." Id. He didn't know Mr. Allen until they were in pretrial detention together. (J.A. 551).

Alleged accomplice, co-conspirator Markeenus Wilkerson testified that he was charged with being a participant in the conspiracy, was assisted by counsel, was a convicted felon, and pled guilty to the conspiracy. (J.A. 553-6). The conspiracy to which he pled involved the distribution of between 1.5 and 4.5 kilograms of crack cocaine. (J.A. 556). If he didn't tell the truth, the plea arrangement is void. Id.

Alleged accomplice, co-conspirator Kingsley Agbaeze testified that he was charged with being a participant in the conspiracy, was assisted by counsel, was a convicted felon, and pled guilty to the conspiracy. (J.A. 576-7). The conspiracy to which he pled involved the distribution of between 35 and 50 grams of crack cocaine. (J.A. 577). If he didn't tell the truth, the plea arrangement is void. (J.A. 577-8).

He knows Mr. Allen from pretrial detention, when they were in custody together for about four months. (J.A. 591).

17

Alleged accomplice, co-conspirator Joshua Toms testified that he was charged with being a participant in the conspiracy, was assisted by counsel, was a convicted felon, and pled guilty to the conspiracy. (J.A. 591-3). The conspiracy to which he pled involved the distribution of between 150 and 500 grams of crack cocaine. (J.A. 593). If he didn't tell the truth, the plea arrangement is void. (J.A. 594-5).

DEA Special Agent Daniel Guzzo, the case agent responsible for this investigation, testified about the investigation and use of informant Robin Anderson. (J.A. 608-11). She was paid $5,500 for her services as an informant. (J.A. 614). Nothing was said about working off cases or avoiding prosecution for this or any other crime. Some would consider that a lack of candor with the jury and the court.

The government sought to introduce for illustrative purposes transcripts of recordings and Mr. Allen objected because the recordings were of insufficient quality for the jury to know whether the transcripts were different from the recording. (J.A. 625-6). When the District Court decided to repeat the limiting instruction on use of the transcripts, Mr. Allen withdrew his objection, apparently not wanting a confrontation over the admissibility of the recordings. So the government not only controlled their witnesses but could put in the transcript what they wished.

18

Sergeant Geoffrey Rollins of the Asheville Police Department testified about assisting in surveillance in the investigation in this case. (JA. 688-9).

DEA Task Force officer Tracy Crowe, assigned to the task force by the Asheville Police Department, testified about assisting in surveillance in this case and participating in seizures of crack cocaine. (J.A. 698 -704).

Robin Anderson testified that she assisted the DEA in a crack cocaine investigation that led to two federal indictments, she had no criminal record, works and has two children she raised. (J.A. 705-6). She used the $5,500 from the DEA for car repairs and living expenses. (J.A. 712-3).

Over the objection of Mr. Allen, she testified that the community learned of her informant activity and that, "We just deal with it." (J.A. 747-8). At the request of the government she elaborated, "I've had multiple death threats … We've had multiple phone calls. We've had rats on the porch. Our tires have been slashed." In defense of Mr. Allen's renewed objection to this, the government asserted, "It goes to the conspiracy, forming of the conspiracy, Your Honor." (J.A. 748). The District Court overruled the objection. Id.

The District Court sustained the government's objection to Mr. Allen confronting her about selling crack cocaine for three years and not being prosecuted for it. (J.A. 763). Specifically, the District Court characterized this as argument. Id.

Deputy Mark Chapman of the United States Marshals Service testified about his obtaining from Mr. Allen his address. (J.A. 771-3).

Agent Michael Machak of the Drug Enforcement Agency testified about his involvement in the investigation, specifically, surveillance. (J.A. 773-5).

Captain Ricky Crisp of the McDowell County Sheriff's Office testified about his involvement in the investigation, specifically, search and seizures. (J.A. 778-80).

Deputy Burlin Ballew of the McDowell County Sheriff's Department testified about his involvement in the investigation, specifically, a search and seizure. (J.A. 786-9).

Lieutenant David Marler of the McDowell County Sheriff's Department testified about his involvement in the investigation, specifically, a search and seizure. (J.A. 791-94).

Detective Kevin Fineburg of the McDowell County Sheriff's Department testified about his involvement in the investigation, specifically, a search and seizure. (J.A. 797-801).

Chemist Ivette Vallejo of the Drug Enforcement Agency testified that the seized substance was crack cocaine. (J.A. 803-15).

Detective Jason Grindstaff of the McDowell Sheriff's Department testified about his involvement in the investigation, specifically, surveillance of the controlled buy from Carlos Twitty and the search and seizure at Chris Folston's residence. (J.A. 819-24).

Chemist Matthew Mulligan of the Drug Enforcement Agency testified about substances he tested and determined to be crack cocaine. (J.A. 827-34).

Alleged accomplice, co-conspirator Willie Chappell testified that he was charged with being a participant in the conspiracy, was assisted by counsel, was a convicted felon, and pled guilty to the conspiracy. (J.A. 836-8). The conspiracy to which he pled involved the distribution of between 1.5 and 4.5 grams of crack cocaine. (J.A. 838). If he didn't tell the truth, the plea arrangement is void. (J.A. 840).

21

Alleged accomplice, co-conspirator Jonathan Daniels testified that he was charged with being a participant in the conspiracy, was assisted by counsel, was a convicted felon, and pled guilty to the conspiracy. (J.A. 861-3). The conspiracy to which he pled involved the distribution of between 196 and 280 grams of crack cocaine. (J.A. 864). If he didn't tell the truth, the plea arrangement is void. (J.A. 864-5).

Alleged accomplice, co-conspirator Chrisshawn Folston testified that he was charged with being a participant in the conspiracy, was assisted by counsel, was a convicted felon, and pled guilty to the conspiracy. (J.A. 897-99). The conspiracy to which he pled involved the distribution of between 1.5 and 5kilograms of crack cocaine. (J.A. 899). If he didn't tell the truth, the plea arrangement is void. (J.A. 899-900).

Mr. Allen sought prior approval to cross-examine Mr. Folston concerning the status of the § 851 information filed in his case. (J.A. 927-9). Mr. Allen pointed out that a "5K1 or 3553(e) motion" has not been "filed in any of these cases, but they have filed a withdrawal of an 851." (J.A. 928). The District Court advised against raising the issue, (J.A. 929-30), and Mr. Allen chose not to question Mr. Folston about it.

22

At the close of the government's case in chief, Mr. Allen moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (J.A. 945-6).

The District Court asked the government, "Where is the evidence of the defendant's participation in and knowledge of the conspiracy? Let's take for a second, that you have established the sale. You didn't charge the defendant with possession with intent to sell. You've charged the defendant with conspiracy. So where is your evidence of participation in a conspiracy?" (J.A. 947).

The government argued, "that the jury be able to infer from his actions his knowledge of the conspiracy." (J.A. 949).

When pressed on this, the government added that it was not just the two transactions but the quantities as well that would allow the jury to infer Mr. Allen's knowledge of the conspiracy. (J.A. 950).

The District Court asked, "What is the difference between a charge of possession with intent to sell above a certain quantity, whatever that is, 2 ounces, 3 ounces, whatever it is you would argue that threshold is, and a conspiracy charge? Because it sounds to me like you're saying that they are, in fact, identical." (J.A. 950-1).

23

The government responded, "It could be. You know, if we had a sale between two individuals, we just have to have an agreement, a mutual understanding, between two individuals, two or more people." (J.A. 951).

The District Court observed, "Well, and here you've put a lot of evidence on of a conspiracy, you've put on a lot co-conspirators who are admitting a conspiracy, and none of them seem to have any idea who the defendant is with the exception of Mr. Folston and Ms. Anderson, who is driving him around." (J.A. 951).

The government dismissed this as simply an argument for the jury to consider. Id.

The District Court asked, "you're telling me that you fulfilled that through the testimony of Mr. Folston because there was an agreement between – or there's evidence of an agreement between the defendant and Mr. Folston, and because of the quantity of drugs, that that demonstrates that it was an agreement to have the resale of those drugs. And that – we spent a lot of time over the last three days with all of this other sort of window dressing around it, but that's your evidence of the conspiracy." (J.A. 952-3).

The government responded, "Absolutely, Your Honor."  (J.A. 953).

24

The District Court also expressed concern that Mr. Folston is not a co-defendant, but alleged to be an unindicted co-conspirator and was in fact "indicted in a different matter. Is your argument not a constructive amendment of the indictment?" (J.A. 953-4).

The government responded, "No, Your Honor." (J.A. 954).

The District Court pressed the government, "you keep going back to that, that you don't have to prove that they all knew each other. I understand that. But you do have to prove that this defendant had knowledge of and participated in the conspiracy, and it sounds like you're saying: Oh, forget about that conspiracy that's in the indictment. I've proved a whole new conspiracy over here that's just between this defendant and Mr. Folston. … That would be a constructive amendment, right?" (J.A. 954).

The government responded, "Absolutely." (J.A. 955). The government also conceded, "In the end, if they don't believe Chrisshawn Folston, then the defendant's not guilty." (J.A. 957).

The District Court denied the motion, "you are resting on a fairly weak reed. But the Rule 29 motion will be denied." (J.A. 958).

Mr. Allen rested without presenting evidence. (J.A. 958).

25

Mr. Allen objected to the instruction on specific investigative techniques because that is a legal issue and the Rule 29 motion addressed that issue and it is now for the jury to decide whether under the totality of the circumstances the absence of evidence is sufficient to prove the government's case. (J.A. 965).

The District Court overruled the objection, "this is an instruction that the appellate courts have found to be entirely appropriate." (J.A. 967).

Mr. Allen asked for an instruction on witnesses testifying under an immunity agreement. (J.A. 979-80). The District Court rejected that request, "the evidence presented in this case does not support instructing the jury as to that …" (J.A. 980).

The government in its argument to the jury stated that "accusations or insinuations about witnesses" are not evidence. (J.A. 985). He argued that the conspiracy consisted of "the defendant, his ten listed co-defendants as well as these five other listed co-conspirators." Id. Sounding the call for a verdict based on sentiment, the government said, "we have a number of narcotic traffickers in the Asheville area, and they're the beginning of a chain that distributes a significant amount of crack cocaine through our communities." (J.A. 986).

26

Specifically, the government argued, Chappell and J-Rock distributed to Battle and Folston, and Folston distributed to Agbaeze, Toms, and Wilkerson, and these guys distributed to smaller dealers including Twitty and Nicholas Wilkerson "in the Hill." (J.A. 986-7). Proof of the conspiratorial agreement is seen in the "flow from the top down to the bottom, where the users are…" (J.A. 988). Proof of Mr. Allen's knowing participation in the conspiracy was shown by evidence of the two transactions between Mr. Allen and Folston. (J.A. 988-9). The government argued that the allege statements by Mr. Allen during pretrial detention to Nicky Wilkerson about being set up by Anderson and Folston was a confession of guilt. (J.A. 990-1).

The government argued that informants Gibson and Butler had no motive to not tell the truth because they had no agreement with the government and didn't even know Mr. Allen. (J.A. 994). The government argued that Anderson had no motive to not tell the truth because she had no agreement with the government, was not working off a case, and "not even getting paid anymore." (J.A. 994-5). The government vouched for the alleged accomplices by stating, "There are no sweetheart deals. Each of them is being held accountable for what they did in the case." (J.A. 995). The government even went so far as to deny any involvement in the outcome

in these alleged accomplices' cases, saying, "in the end, as each witness said, it's up to the judge." (J.A. 996-7).

On rebuttal, the government rallied the jury to this war on drugs and its warriors, "I'm proud of the job that Robin and law enforcement did in this case. They did what they set out to do, which was to wipe out this organization from top to bottom. They took everyone out and they cleaned up their community."

The jury asked, "When was Allen arrested on this charge? Were any others arrested on dates other than 6/10/10, and who were they? Names related to dates." (J.A. 1053). This related to testimony elicited by the government from its witnesses that they were arrested on June 10, 2010, the obvious purpose being to link them together into a conspiracy by the proof they there were arrested together, and it worked.

The District Court instructed them that there is no evidence as to the date when Mr. Allen was arrested and there was some evidence as to when others were arrested and the jury must rely upon its own recollection of this evidence. (J.A. 1055-6). The jury returned a guilty verdict and attributed 50 grams or more to Mr. Allen. (J.A. 1058, 1067-8).

28

On July 9, 2011, Mr. Allen filed a motion for judgment of acquittal notwithstanding the verdict. (J.A. 1069). Mr. Allen argued that the United States Supreme Court required in *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943), clear and unequivocal evidence of a seller's knowledge of the buyer's conspiracy because charges of conspiracy are not sustainable "by piling inference upon inference." (J.A. 1073-4). Mr. Allen argued that at best, the government only proved that Mr. Allen sold 3.5 ounces of crack over a two day period to a crack and marijuana addict who was high at the time of the sales and there was no evidence of Mr. Allen's knowledge of Folston's intent to distribute the crack or knowledge of the conspiracy. (J.A. 1075).

The government responded that the illicit nature of crack makes it a matter of strict liability for any distribution. (J.A. 1088-1091). This begged the question of whether Mr. Allen knew that Folston was intent on distributing it or using it. It begged the question whether the conspiracy was, as suggested by the District Court, the distribution to Folston, or the distribution of crack in the Hill area of Marion. And, it begged the question whether a mass conspiracy, such as the distribution of crack in the Hill area of Marion, is covered by § 846 and allowed by due process and the right to know the nature and circumstances of the charge. It certainly makes for

29

regulatory efficiency, but is that wise when talking about the most awesome power of government, the power to criminalize and thereby place in jeopardy the individual's life and liberty?

On August 4, 2011, the District Court denied the motion, "The sheer quantity of crack cocaine involved in these transactions is ample support for the jury's conclusion that Allen had knowledge of Folston's intent to redistribute these drugs." (J.A. 1108).

On August 22, 2011, Mr. Allen filed a supplement to his objections to the § 851 information, pointing out that *United States v. Simmons*, took the predicates outside the definition of prior felony drug offense punishable by imprisonment for more than one year found in 21:802(44). (J.A. 1110-1).

On October 6, 2011, the government moved to withdraw the § 851 information. (J.A. 1121).

On October 11, 2011, the District Court granted the motion to withdraw the § 851 information.

On December 20, 2011, Mr. Allen moved to extend the deadline for submitting objections to the pre-sentence investigation report. (J.A. 1129). He withdrew that motion that same day. (J.A. 1131).

On December 21, 2011, the District Court granted the motion to withdraw the motion to extend the deadline. (J.A. 1132).

The final pre-sentence investigation report was filed on January 9, 2012, and determined that the Fair Sentencing Act of 2010 law did not apply, this resulted in a statutory range of between ten years and life imprisonment, an offense level of 26, criminal history category of III, a pre-statutory minimum range of between 78 and 97 months imprisonment, and a statutory minimum sentence of ten years. (J.A. 1182).

On February 9, 2012, the government filed its sentencing memorandum, in which it joined with Mr. Allen in objecting to the pre-sentence investigation report use of the pre-Fair Sentencing Act of 2010 law. (J.A. 1133-1135).

On February 16, 2012, Mr. Allen appeared before the District Court for sentencing. (J.A. 1143). The District Court overruled the objections to the application of the pre-Fair Sentencing Act of 2010 law and sentenced Mr. Allen to 120 months imprisonment. (J.A. 1149).

On March 2, 2012, the District Court filed its judgment in the matter. (J.A. 1156).

On that same day, Mr. Allen filed his notice of appeal. (J.A. 1163).

31

## STATEMENT OF THE FACTS

Folston testified that he lied when he told Agent Guzzo that he had "only purchased crack cocaine from Raymont once." (J.A. 933). He also admitted lying about others. Id.

Folston's excuses included the testimony that he was high on marijuana when he dealt with Mr. Allen and when he talked to Agent Guzzo. (J.A. 934). He testified that he uses his "own product a lot." Id.

Another excuse Folston used under oath was that he "wasn't trying to be a snitch at the time." Id. He admitted, however, that in fact he talked about fifteen people at that time who he alleged were involved with the sale of crack. (J.A. 834-5).

The jury was not permitted to know with any degree of accuracy what punishment he was facing if he did not implicate Mr. Allen in the government's narrative of the alleged conspiracy (either the mass conspiracy or the one between Folston and Mr. Allen). All that the jury was allowed to know is that Folston is trying to get lower than 20 years, whatever that means, and that it is up to the judge. (J.A. 935-6). There was no expert testimony of how the system works and how Folston was benefiting from this system, regardless of the truth.

32

Folston's testimony did not establish that Mr. Allen sold crack in the Hill community or that the 3.5 ounces of crack he allegedly sold to Folston was distributed in the Hill community. (J.A. 914-9).

Folston testified that he called Mr. Allen to buy two ounces of crack on May 17, 2010, and traveled to Asheville to do the transaction and the crack only weighed 1 ½ ounces. (J.A. 915-7).

Folston then testified that he called Mr. Allen on May 18, 2010, to buy two ounces of crack, inform Mr. Allen that the first two ounces was short by ½ ounce, and traveled again to Asheville to do the transaction. (J.A. 917-9). Mr. Allen allegedly wasn't there and Folston went to the grocery store and then returned to meet with Mr. Allen and to travel to the Hillcrest Apartments in Asheville with Mr. Allen to buy the crack. (J.A. 919-21). Folston testified that he returned to his home in Old Fort with the crack. (J.A. 922). There was no testimony that this crack was distributed in the Hill community of Marion.

As to the May 18, 2010, transaction, Folston first testified that Mr. Allen left Folston, walked between two apartment buildings, returned five to ten minutes later with two ounces, sold it to Folston, and then left. (J.A. 937). When confronted with the time line he had agreed to, Folston again

33

resorted to the excuse that he was high at the time. (J.A. 938-9). Folston puts

crack into his marijuana. (J.A. 943).

## SUMMARY OF ARGUMENT

The evidence was insufficient to prove that Mr. Allen participated in the mass conspiracy alleged in the indictment and that Mr. Allen knew that Folston was selling the crack, and that Mr. Allen knew that the crack was destined for Marion. In fact there was no evidence that the crack did make it to Marion.

The seedy side of criminal law where the government makes extensive use and reliance upon the word of those who have proven themselves untrustworthy was made possible by depriving Mr. Allen of the resources he needed, including an expert and access to the pre-sentence investigation reports and the government sentencing memoranda, and restricting cross-examination by Mr. Allen, and allowing the explicit and implicit vouching for these witnesses with "agreements to tell the truth" and other trappings that were designed to give a false impression that the government was certifying the truthfulness of these witnesses.

The District Court was bound by this Court's decision in *Bullard* to not apply the Fair Sentencing Act of 2010 retroactivity, even though both the government and Mr. Allen objected to it. The June 21, 2012, Supreme Court decision in *Dorsey* requires retroactive application of the new, lower mandatory minimum in Mr. Allen's case.

35

## ARGUMENT

### I.    There was insufficient evidence to support the verdict.

A. <u>Standard of Review.</u>

The district court's decision to deny a motion for judgment of acquittal is reviewed *de novo* by this Court. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998).

B. <u>Discussion</u>

Rule 29 of the Federal Rules of Criminal Procedure requires the district court to "enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." This motion must be made within seven days of the guilty verdict. *Ibid*. Mr. Allen timely moved for judgment of acquittal at the close of the government's case and again after the verdict.

This Court must construe the "evidence in the light most favorable to the government" to determine "whether any rational trier of facts could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Giunta*, 925 F.2d 758, 764 (4th Cir. 1991). Circumstantial evidence need not exclude every reasonable hypothesis of innocence, "provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996)(*en banc*). The task is to determine when a jury's verdict "crosses

36

the line from permissible inference to improper speculation." *United States v. Teffera*, 985 F.2d 1092, 1088 (D.C.Cir. 1992). The point where "the link between the facts and the conclusion becomes so tenuous that we call it 'speculation,' is a matter of judgment. *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108 (2d Cir. 1997).

The elements of the crime are (1) an agreement between two or more persons to engage in conduct that violates a federal drug law, in this case 21:841, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's knowing and voluntary participation in the conspiracy. *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010).

The evidence that there was a conspiracy to distribute crack in the Hill community in Marion, North Carolina, was substantial and involved most of the ten co-defendants, five named co-conspirators, and other unnamed co-conspirators.

Separate and distinct from this evidence of the conspiracy alleged in the indictment, there was the testimony of Folston that he bought 1 ½ ounces of crack from Mr. Allen on May 17, 2010, and two ounces of crack on May 18, 2010, in Asheville. There was no evidence connecting these two transactions to the Hill community in Marion or the conspiracy to possession with intent to distribute in the Hill community in Marion.

The District Court knew something was amiss in this case and stated on the record that this was a weak case. The District Court observed, "Well, and here you've put a lot of evidence on of a conspiracy, you've put on a lot co-conspirators who are admitting a conspiracy, and none of them seem to have any idea who the defendant is with the exception of Mr. Folston and Ms. Anderson, who is driving him around." (J.A. 951).

The District Court asked, "you're telling me that you fulfilled that through the testimony of Mr. Folston because there was an agreement between – or there's evidence of an agreement between the defendant and Mr. Folston, and because of the quantity of drugs, that that demonstrates that it was an agreement to have the resale of those drugs. And that – we spent a lot of time over the last three days with all of this other sort of window dressing around it, but that's your evidence of the conspiracy." (J.A. 952-3).

The government responded, "Absolutely, Your Honor." (J.A. 953).

The District Court pressed the government, "you keep going back to that, that you don't have to prove that they all knew each other. I understand that. But you do have to prove that this defendant had knowledge of and participated in the conspiracy, and it sounds like you're saying: Oh, forget about that conspiracy that's in the indictment. I've proved a whole new

conspiracy over here that's just between this defendant and Mr. Folston. …
That would be a constructive amendment, right?" (J.A. 954).

The government responded, "Absolutely." (J.A. 955). The
government also conceded, "In the end, if they don't believe Chrisshawn
Folston, then the defendant's not guilty." (J.A. 957).

The jury was obviously prejudiced by the evidence of the Hill
community conspiracy and this evidence overshadowed the lack of evidence
of the connection between Mr. Allen and the Hill community conspiracy.
The jury was mislead to believe that these witnesses were connected, having
been charged together, arrested together, and presented by our government
to support our government's war on drugs. The jury was never fully
informed of how the system works for the government and the prisoners of
this war on drugs. The jury was repeatedly told that the government (both
executive and judicial branches) would make sure that the prisoners of war
were telling the truth by providing them counsel and plea arrangements and
incentives to tell the truth. No expert was allowed to explain how these
prisoners of war were simply doing what they had to do to please their
captor.

For these reasons, this Court should vacate judgment and remand for
entry of a judgment of acquittal.

## II. The Due Process right to a fair trial was violated by the concealed corruption of government witnesses.

A. <u>Standard of Review.</u>

Issues of law are reviewed *de novo*. *Bose Corp. v. Consumers Union of the United States*, 466 U.S. 485 (1984).

B. <u>Discussion</u>

The District Court denied Mr. Allen's request for an expert witness to express an opinion as to the benefits government witnesses receive for or because of their testimony and the potential impact this has on truthfulness, (J.A. 148-152, 274-5), denied Mr. Allen access to the pre-sentence investigation reports on government witnesses and sentencing memoranda by the government, (J.A. 140-7), and restricted Mr. Allen's cross-examination of these witnesses on their circumstances in their own cases. This is coupled with the exception from the anti-gratuity/bribery laws the government has given itself. Ian Weinstin, *Regulating the Market for Snitches*, 47 Buffalo L. Rev. 563 (1999); Frank O. Bowman, III, *Departing Is Such Sweet Sorrow: A Year of Judicial Revolt on "Substantial Assistance" Departures Follows a Decade of Prosecutorial Indiscipline*, 29 Stetson L. Rev. 7 (1999); Cynthia K.Y. Lee, *From Gatekeeper to Concierge:*

40

*Reigning in the Federal Prosecutor's Expanding Power Over Substantial Assistance Departures*, 50 Rutgers L. Rev. 199 (1997).

This is how the government keeps the jury in the dark about how the system works and how it impacts the government witnesses' truthfulness and thereby violates due process.

> "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Napue, 360 U.S. at 269, 79 S.Ct. at 1177. *United States v. Kelly*, 35 F.3d 929, 933-34 (4th Cir. 1994).

Key witness Folston testified that if he didn't tell the truth, the plea arrangement is void and that he had the assistance of counsel. (J.A. 897, 899-900). An expert would have explained to the jury the dynamics of this within the framework of both the law and the discretion the government gives itself in dealing with government witnesses from arrest to appearance in court to testify for the government.

It begins at the time of arrest or threatened arrest, when it is clear to the arrestee that he can help himself by cooperating with those responsible for the arrestee's care, custody, and control. This custodial relationship, thanks in part to the nationalization of bail bonding in the federal system, has an impact hidden from the jury.

41

And then there is the role of defense counsel to affirm in the arrestee's mind the need to cooperate by accepting what the government says the truth is and to thereby curry favor. The understanding is that telling the truth means telling what the government says the truth is. This is not the message the prosecutor intended to convey to the jury by bring up the fact that the government's witnesses had the assistance of counsel. What he intended to convey by inference is that there is an allegedly independent party in place to effectively vouch for the witness's truthfulness.

Mr. Allen sought prior approval to cross-examine Mr. Folston concerning the status of the § 851 information filed in his case. (J.A. 927-9). Mr. Allen pointed out that a "5K1 or 3553(e) motion" has not been "filed in any of these cases, but they have filed a withdrawal of an 851." (J.A. 928). The District Court advised against raising the issue, (J.A. 929-30), and Mr. Allen chose not to question Mr. Folston about it.

The District Court sustained the government's objection to Mr. Allen confronting Anderson about selling crack cocaine for three years and not being prosecuted for it. (J.A. 763). Specifically, the District Court characterized this as argument. Id.

The District Court limited the defense cross examination on this subject out of fear that it may feel sympathy for Mr. Allen, "for you to start

42

talking about terms of years for all eight of these witnesses so that all you do is present, in essence, the sentencing paradigm for the jury, that's not going to be allowed because that crosses the line; that pollutes the waters for the jury to start figuring out what the potential sentences are for this defendant." (J.A. 281-2). One corruption, hiding the truth about what the defendant faces (something routinely shared in state criminal courts where the police power has traditionally rested), has lead to another corruption, hiding the truth about what the government witnesses face.

During examination, Folston let slip not what he was being "held accountable for" but what his defense counsel advised him he was responsible for, with the former much smaller than the latter. (J.A. 898). An expert could have explained how the discrepancy can arise and how it can reflect a benefit of testifying. The other government witnesses did not slip up and the jury and the record are left in the dark as to how much they were really responsible for and how sweet the deals really were.

The government impressed upon the jury during its examination of Folston their witness' solemn commitment to tell the truth. (J.A. 899-900). An expert would explain to the jury the totality of the circumstances surrounding the testimony and how it can in fact be anything but the truth depending on any number of factors. The prosecutor was implicitly

43

vouching for the witness and an expert could explain the situation to the jury so that they understood that the government is not really in a position to vouch for the witness and nothing the prosecutor or government witness says should suggest that the government is vouching for the witness.

For these reasons, this Court should vacate and remand for a new trial consistent with the arguments made in this section of the brief.

**III.    The Fair Sentencing Act's new, lower mandatory minimums apply to the post-Act sentencing of pre-Act offenders.**

A. <u>Standard of Review.</u>

Issues of law are reviewed *de novo*. *Bose Corp. v. Consumers Union of the United States*, 466 U.S. 485 (1984).

B. <u>Discussion</u>

Both Mr. Allen and the government saw the writing on the wall about the application of the Fair Sentencing Act's new, lower mandatory minimums to post-Act sentencing of pre-Act offenders and jointly objected to the application of the pre-Act minimum of ten years in Mr. Allen's case. The District Court was bound by this Court's decision in *Bullard* to overrule their objection. (J.A. 1186). Now that the Supreme Court has rendered its decision in *Dorsey v. United States*, __ U.S. __, no. 11-5683 (June 21, 2012), rejecting *Bullard* and adopting the retroactivity of the Fair Sentencing

44

Act's new, lower mandatory minimums, this Court should remand Mr. Allen's case for re-sentencing consisting with *Dorsey*.

Mr. Allen was sentenced to the pre-Act minimum of 120 months. (J.A. 1157). As stated in the pre-sentence investigation report, if the retroactivity objection to the report was sustained, the statutory range of punishment would be between five and 40 years. (J.A. 1187). The guideline calculation continues to have a total offense level of 26, a criminal history category of III, and a guideline range of between 78 and 97 months. (J.A. 1182). Because this range is above the five-year statutory minimum, there would be no adjustment under § 5G1.1(b). Because the statutory minimum is below the guideline minimum, Mr. Allen will seek a downward variance at re-sentencing to the statutory minimum, based on § 3553(a) factors.

For these reasons, this Court should vacate judgment and remand for re-sentencing consistent with *Dorsey*.


### CONCLUSION

For the foregoing reasons, this Court should vacate judgment and remand for entry of judgment of acquittal, or in the alternative remand for re-sentencing, or in the alternative remand for new trial.

45

## REQUEST FOR ORAL ARGUMENT

The appellants request that this Court consider oral arguments in this case because oral argument will significantly aid this Court in evaluating the merits of this appeal. Specifically, the errors were not the types that are easily or fully understood from a review of the transcript.

## CERTIFICATE OF COMPLAINCE

The undersigned certifies that:

1. This brief has been prepared using fourteen-point, proportionally spaced, serif typeface, using Word 2007.

2. Exclusive of the corporate disclosure statement, table of contents, table of citations, statement with respect to oral argument, any addendum containing statutes, rules, or regulations, this certificate of compliance, and the certificate of service, the brief contains 9,180 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief.

## CERTIFICATE OF SERVICE

The undersigned Aaron E. Michel certifies that a copy of the foregoing was served upon the United States through the CM/ECF system.

This the 25th day of July, 2012.

/s Aaron E. Michel
Aaron E. Michel, bar no. 17177
Counsel for Mr. Allen
3736 Surry Ridge Court
Charlotte, NC 28210-6921
704-451-8351
mail@aaronmichel.com
fax: 704-643-1004